# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ILLINOIS CENTRAL RAILROAD COMPANY,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) ) ) | **Case No. 3:10-cv-00197** **Judge Sharp** **Magistrate Judge Griffin** |
| **TENNESSEE DEPARTMENT OF REVENUE and REAGAN FARR, Commissioner of Revenue of the State of Tennessee** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## DEFENDANTS' TRIAL BRIEF

The Defendants, Tennessee Department of Revenue and Reagan Farr (and by automatic substitution pursuant to Fed. R. Civ. P. 25(d) of his successor in office, Richard H. Roberts), Commissioner of Revenue for the State of Tennessee (collectively referred to hereafter as "Commissioner" or "Department"), submit the following Trial Brief with respect to the trial scheduled to commence on June 5, 2012.

### Introduction

In every year except one since 1941, when Tennessee's motor fuel tax was first enacted, motor carriers have paid a higher tax per gallon on their consumption of diesel fuel in Tennessee than have railroads. Since 1947, when Tennessee's sales and use tax was first enacted, railroads have been subject to Tennessee's sales and use tax on their purchase or use or consumption of tangible personal property, including diesel fuel, in this state. Tenn. Code Ann. §§ 67-6-201, 202, and 203 (2006 Repl.). For all tax years at issue here the sales and use tax rate was 7% of

the purchase price. Since the sales and use tax was first enacted, on-highway motor carriers have been exempt from sales and use taxes on their use or consumption of diesel fuel, § 67-6-329 (a)(2), because they have been subject to the motor fuel tax (now known as the Diesel Tax), which for all years at issue here was 17 cents per gallon. §§ 67-3-202, 203, and 204[1]. Under these respective tax rates railroads pay less tax per gallon than motor carriers pay unless the price of diesel fuel exceeds $2.42 per gallon. Since 1941, railroads have paid a higher tax per gallon than motor carriers in only one year, when diesel fuel prices paid by railroads spiked in 2008[2]. *See* Exhibit 1, columns G and H.

Plaintiff contends that the imposition of Tennessee sales and use tax on diesel fuel purchased or consumed for rail transportation purposes is discriminatory under Section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94-210, 90 Stat 54 (February 5, 1976), now codified as 49 U.S.C. § 11501 and commonly referred to as the 4-R Act. Section 306 pertains primarily to property taxes, but subsection (b)(4), commonly referred to as the catch-all provision, prohibits "any other tax which results in discriminatory treatment of a common carrier by railroad subject to this part." 49 U.S.C. § 11501 (b)(4). Plaintiff's claim of discrimination is based solely on the fact that motor carriers, their primary competitors, are exempt from the sales and use tax paid by the railroads. Plaintiff seeks a ruling that any tax imposed on railroads and not imposed on competitors of railroads is *per se* discriminatory under subsection (b)(4) regardless of taxes imposed on competitors (and not imposed on railroads) for

---

[1] Both railroads and motor carriers pay the additional 1.4 cents imposed by §§67-3-203 and 204. Thus 1.4 cents per gallon is ignored for comparison purposes.

[2] The motor fuel tax has always been levied at a fixed rate per gallon, regardless of price. Under the respective rates imposed in years both before and after 2008, motor carriers have always paid a higher tax per gallon than railroads have paid. *See* Exhibit 1(setting forth the respective rates of motor fuel taxes and sales and use taxes since 1941, along with diesel fuel prices paid by railroads since 1955).

precisely the same activity, the purchase or consumption of diesel fuel, and regardless of the respective tax rates.

If the court rules, as the Commissioner urges, that the proper comparison class is a class consisting of all commercial and industrial taxpayers subject to the sales and use tax, then no comparison of taxes and rates is necessary because Tennessee's sales and use tax applies to "every person," Tenn. Code Ann. § 67-6-201, unless a specific exemption is applicable, and is easily the most broadly applicable tax imposed by the state. *See id.* at §§ 67-6-201-203. If the court rules that the proper comparison class is a class consisting of the railroad's competitors, under the recent holding of the United States Supreme Court in *CSX Transportation, Inc. v. Alabama Department of Revenue*, 131 S.Ct. 1101 (2011), this court must consider the respective taxes and tax rates that apply to identical activities of railroads and their competitors. In any event, the Commissioner should prevail as a matter of law regardless of the comparison class.

## I. *CSX Transportation, Inc. v. Alabama Department of Revenue*

In *CSX* the railroad challenged the imposition of Alabama's sales and use (excise) taxes on its purchase or consumption of diesel fuel. Unlike Tennessee, Alabama exempted both motor carriers and water carriers from the sales and use tax on their purchase and consumption of diesel fuel. Motor carriers were subject to a separate excise tax, but water carriers paid no tax on fuel purchases. *CSX,* 131 S.Ct. at 1106. In Tennessee water carriers are subject to the same sales and use tax that applies to railroads. Tenn. Code Ann. § 67-6-202.

In considering the railroad's claim, the Supreme Court held only that "a state excise tax that applies to railroads but exempts their interstate competitors is subject to challenge under subsection (b)(4)." *CSX,* 131 S.Ct. at 1109. The Supreme Court further stated:

> Our decision in this case is limited. We hold that CSX may challenge Alabama's sales and use taxes as "tax[es] that discriminat[e]

against ... rail carrier[s]" under § 11501(b)(4). We do not address whether CSX should prevail in that challenge—whether, that is, Alabama's taxes in fact discriminate against railroads by exempting interstate motor and water carriers.

*CSX Transportation,* 131 S.Ct. at 1114; *see also* page 1107, n.5.

The *CSX* court, however, provided guidance for undertaking the discrimination analysis:

This conclusion does not . . . turn railroads into "most-favored-taxpayers," entitled to any exemption (or other tax break) that a State gives to another entity. We hold only that § 11501(b)(4) enables a railroad to challenge an excise tax or other non-property tax as discriminatory on the basis of the tax scheme's exemptions. . . . *Whether the railroad will prevail – that is, whether it can prove the alleged discrimination – depends on whether the State offers a sufficient justification for declining to provide the exemption at issue to rail carriers.*

*CSX,* 131 S.Ct. at 1109, n.8 (emphasis added) (quoted in *Kansas City Southern Ry. Co. v. Koeller*, 653 F.3d 496, 510 (7th Cir. 2011)). The necessary implication is that there can, in fact, be sufficient justification, and that the court must evaluate the justification offered. Here, the "sufficient justification" is obvious. When the sales and use tax was enacted in 1947, and through today, Tennessee has declined to provide an exemption to railroads because they are not and never have been subject to the previously enacted motor fuel tax. *See* Tenn. Public Acts, 1941, Chapter 73, §§ 1(a), 1(b), 1(c), and 2; Tenn. Public Acts, 1947, Chapter 3, §§ 1, 2, 3, and 6 (copies attached to Exhibit 1); Tenn. Code Ann. §§ 67-3-103 (48), 67-3-202-204; 67-6-202, 203, and 329 (a)(2) (2006 Replacement). Stated differently, motor carriers have always been exempted from the sales and use tax because, since six years before the sales and use tax was first enacted, they always have been subject to the higher (except in 2008) motor fuel tax. Thus, an exemption from the sales and use tax for railroads would have turned them into "most-favored-taxpayers," a status expressly disavowed by *CSX*.

4

More recently, Tennessee, along with the other 47 contiguous states and bordering Canadian provinces, has become a party to the International Fuel Tax Agreement ("IFTA"), the purpose of which is to simplify the collecting and reporting of motor fuel taxes used by motor carriers operating in more than one jurisdiction. IFTA is authorized and to some extent regulated by Congressional enactments. *See* 49 U.S.C.A. § 31705. To comply with IFTA requirements, a "fuel use tax" must be "imposed on or measured by the consumption of fuel in a motor vehicle." 49 U.S.C.A. § 31701(2). IFTA tax returns list tax rates for every jurisdiction in terms of tax per gallon or liter, not as a percentage of the purchase price. [Exhibit 4, Rowan Deposition] IFTA requirements alone, which have Congress's stamp of approval, are thus a sufficient justification for the difference in tax treatment between motor carriers and railroads.

Explaining further, the *CSX* Court stated:

> Discrimination cases sometimes do raise knotty questions about whether and when dissimilar treatment is adequately justified. . . . Difficult issues can emerge when, as here, States provide certain entities with tax exemptions. . . . Congress has directed the federal courts to review a railroad's challenge; and . . . we would flaunt the congressional command were we to declare the matter beyond us.

*CSX*, 131 S.Ct. at 1114.

A graphic comparison of the respective taxes and rates that apply to exactly the same activity, *see* Exhibit 1, columns F, G, and H, is neither "difficult" nor "knotty," and the express language of *CSX* requires those comparisons to be made. The issue is simple: how much tax does the state require the respective transportation modes to pay when they engage in exactly the same activity, the purchase or consumption of diesel fuel. As demonstrated below, the respective tax burdens do not "discriminate" against railroads.

5

## II.  The Proper Comparison Class Is the
## Class of All Other Commercial and Industrial Taxpayers.

In 1976, Congress enacted the 4-R Act to restore financial stability to the railroad system in the United States.  The purpose of the 4-R Act was to revitalize the railroads and protect them from discriminatory taxation.  *See Atchison, Topeka and Santa Fe Ry. Co. v. State of Arizona*, 78 F.3d 438, 440 (9th Cir. 1996), abrogated on other grounds by *CSX*[3].

Virtually all 4-R Act cases struggle to identify the proper comparison class.  The Commissioner submits that the proper comparison class in exemption-based subsection (b)(4) challenges is the class of all other commercial and industrial taxpayers that are subject to the tax being challenged.  This is the conclusion reached in *ATSF,* 78 F.3d at 441, in a subsection (b)(4) challenge, which like here was based upon an exemption for motor carriers from the privilege tax that applied to railroads.  *Id.,* 78 F.3d at 439.  The *ATSF* court ruled that a "narrow comparison class, comprised only of 'motor carriers,' would result in preferential treatment for the railroads," *id.,* 78 F.3d at 442, "which Congress certainly did not intend."  *Koeller,* 653 F.3d at 509.  The *ATSF* holding is consistent with the comparison class that must be used when challenges are brought under subsections (b)(1), (b)(2), and (b)(3), and with rulings in two other circuits.  In another subsection (b)(4) case, *Kansas City Southern Ry. v. McNamara,* 817 F.2d 368 (5th Cir. 1987), the court stated:

> The only simple way to prevent tax discrimination against the railroads is to tie their tax fate to the fate of a large and local group of taxpayers. . . .  We think the best course is to require that the railroads be taxed only under taxes applicable to "*other commercial and industrial" taxpayers.*

---

[3] *ATSF* held that a subsection (b)(4) challenge based upon the exemption of the railroad's competitor from a generally applicable tax was not cognizable under the holding of *Department of Revenue of Oregon v. ACF Industries, Inc.*, 510 U.S. 332, 114 S.Ct. 843 (1994).  It is only this precise holding that is abrogated by *CSX.*

6

*Id.,* 817 F.2d at 375 (emphasis added) (quoted in *ATSF,* 78 F.3d at 441; and *Koeller,* 653 F.3d at 509). Here the sales and use tax applies to virtually all persons in Tennessee, obviously a "large and local group of taxpayers," thereby marrying the fate of railroads to that of local Tennessee citizens who have both the incentive and the political clout to keep the sales and use tax as low as possible. The *ATSF* court also relied upon the inference in *Burlington Northern Railroad Co. v. City of Superior,* 932 F.2d 1185 (7th Cir. 1991), to the effect that a "tax is 'discriminatory' within the meaning of [subsection (b)(4)] if it imposes a proportionately heavier tax on railroading *than on other activities." ATSF,* 78 F.3d at 441 (emphasis added in *ATSF*), *quoting City of Superior,* 932 F.2d at 1187.

In *CSX* the majority did not address the proper comparison class or how it was to be determined, leaving all such matters to the district court on remand. *CSX,* 131 S.Ct. at 1107, n. 5. The dissenting opinion, however, stated that "the best way to read [subsection] (b)(4) is as prohibiting taxes that target or single out railroads as compared to general commercial and industrial taxpayers." *CSX,* 131 S.Ct. at 1120 (Thomas, J., dissenting). The dissent also pointed out that the majority opinion did not foreclose this option. *Id.* In *Koeller, supra,* the court relied upon and followed *City of Superior, ATSF,* and *McNamara,* in selecting the comparison class of all other commercial and industrial taxpayers. *Koeller,* 653 F.3d at 508-10.

Plaintiff is subject to the most generally applicable tax in the state, the sales and use tax. Plaintiff has not been targeted or singled out. Indeed, an examination of the sales and use tax as amended since 1947 reveals that railroads, as such, have not been separately addressed. They are hardly mentioned. *See* Tenn. Code Ann. § 67-6-329(a)(19) (2006 Repl.) (exempting materials used for the lining or protective coating of railroad tank cars).

### III.  The Motor Fuel Tax on the Same Commodity and the Same Activity Should Be Considered.

If the court elects to use a comparison class consisting of railroads and their primary competitors, motor carriers, *CSX* instructs that the court must compare the respective taxes and rates.  This required comparison is entirely consistent with the other subsections of Section 306, which prohibit the assessment of "rail transportation property at a value that has a *higher* ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property  .  .  .  has to the true market value  .  .  .  ," 49 U.S.C.A. § 11501 (b)(1), and the [l]evy or collect[ion of] an ad valorem property tax on rail transportation property that *exceeds* the tax rate applicable to commercial and industrial property in the same assessment jurisdiction."  49 U.S.C.A. § 11501 (b)(3).  Indeed, the very concept of whether one thing is "higher" than another or "exceeds" another is without meaning absent a quantitative comparison of one to the other.  *See generally City of Superior,* 932 F.2d at 1189-91 (Flaum, J., dissenting).[4]

Plaintiff relies on *Burlington Northern Santa Fe Railway Co. v. Lohman,* 193 F.3d 984 (8th Cir. 1999), and *Union Pacific Railroad Co. v. Minnesota Dept. of Revenue,* 507 F.3d 693 (8th Cir. 2007), to support its contention that only the sales and use tax on railroads should be considered, and that the entire tax structure of a state should not be evaluated in determining whether discrimination under the 4-R Act has occurred.  Plaintiff is correct that the entire tax structure should not be evaluated, but Plaintiff generally is incorrect for four primary reasons.  First, *Union Pacific* merely follows *Lohman*, an earlier panel decision in the same circuit, and adds nothing to the analysis.  Second, as Exhibit 1 demonstrates, an examination of an entire tax

---

[4] Unlike here, *City of Superior* dealt with a tax that was targeted at a railroad and no one else, and it was correctly decided under those facts.  The discussions in both the majority opinion and the dissent regarding the proper analysis of discrimination and why overall tax benefits should not be considered are nevertheless instructive.

8

structure is not necessary when, as here, we are dealing with two easily identifiable and quantifiable taxes that apply to two specific transportation modalities when they purchase or use a gallon of the same commodity, and, further, when the language of the applicable statutes indicates that one use tax[5] is a substitute for the other sales and use tax. *See* Tenn. Code Ann. § 329(a)(2). The difficulties and uncertainties of attempting to evaluate overall tax benefits, as opposed to burdens, are simply not factors when comparing tax burdens per gallon of diesel fuel purchased or consumed. Third, as explained above, *CSX* requires a comparison of tax burdens to be made. Fourth, *Lohman* created a broad *per se* rule not supported by the authority on which it relied. The *Lohman* court relied on its prior ruling in *Trailer Train* and held:

> In *Trailer Train Co. v. State Tax Comm'n,* 929 F.2d 1300 (8th Cir. 1991) we held that a state's overall tax structure need not be examined under the 4-R Act even if fair taxing arrangements exist, such as taxing one business with property taxes and another with sales taxes, " "because the actual fairness of those arrangements is too difficult and expensive to evaluate.' " *Id.* at 1303 (quoting *Kansas City Southern Ry. v. McNamara,* 817 F.2d 368, 375 (5th Cir. 1987)). We thus look only at the sales and use tax with respect to fuel to see if discrimination has occurred. *See Trailer Train,* 929 F.2d at 1303. Within the competitive mode class, only railroads pay the tax. Barges and trucks are exempt. Accordingly, we hold that Missouri's sales and use tax on fuel violates the 4-R Act.

*Lohman,* 193 F.3d at 986. The rule of *Lohman* and *Union Pacific* is that any tax that applies to a railroad and does not apply to all of a railroad's competitors is invalid *per se* under the 4-R Act regardless of any other tax that applies to competitors and regardless of whether the tax on the railroad imposes a "proportionately higher" tax burden[6]. This rule improperly turns railroads

---

[5] The motor fuel tax is only a use tax because under IFTA motor carriers are taxed on their consumption of fuel within the participating jurisdiction.

[6] In *Lohman* the parties stipulated that the only members of the competitive class were rail carriers, motor carriers, and barges. Rail carriers were the only members of the class subject to sales and use tax. *Lohman,* 193 F.3d at 985-86. In *Union Pacific* rail carriers, barges, and ships paid the same tax on fuel, but motor carriers were exempt and paid a separate tax. *Union Pacific,* 507 F.3d at 695-96.

Case 3:10-cv-00197   Document 41   Filed 05/29/12   Page 9 of 22 PageID #: 159

into "most-favored-taxpayers" and is inconsistent with the *CSX* directive to confront "knotty" or "difficult" problems.

Here, water carriers are not exempt. More importantly, however, both *Trailer Train* and *McNamara* relied on *Arizona Public Service Co. v. Snead,* 441 U.S. 141, 99 S.Ct. 1629 (1979), to reach the conclusion that no discrimination analysis was necessary. That misplaced reliance was astutely analyzed in the dissent in *City of Superior*:

> In *Snead* the Supreme Court held that the appropriate way to determine whether a state tax contravened an act of Congress was "[t]o look narrowly to the type of tax the federal statute names, rather than to consider the entire tax structure of the State. [*Snead*], 99 S.Ct. at 1633-34. Applying this approach the Court in *Snead* struck down a New Mexico statute on electricity generated in the state and exported elsewhere as inconsistent with a statute Congress had passed prohibiting discriminatory taxes on power sold out of state. As the defendant in *Snead* conceded, Congress's enactment was aimed directly at the New Mexico tax; indeed, the sponsors of the statute had gone so far as to identify the New Mexico tax by name. *See* 99 S.Ct. at 1632-33. Striking down the tax regardless of whatever other activities New Mexico might tax was thus "faithful not only to the language of the statute but to the expressed intent of Congress in enacting it." 99 S.Ct. at 1634.

*City of Superior,* 932 F.2d at 1190 (Flaum, J., dissenting). In other words, when an act of Congress declares a specific state statute invalid, it is unnecessary "to consider the entire tax structure of the state." The 4-R Act in subsection (b)(4) does no such thing, and *CSX* requires the straightforward quantifiable evaluation of the burden of the motor fuel tax as compared to the burden of the sales and use tax when motor carriers and railroads purchase or use a gallon of diesel fuel. *See* Exhibit 1. As stated in *Burlington Northern Railroad Co. v. Commissioner of Revenue,* 606 N.W.2d 54 (Minn. 2000), "[I]n addition to the fact that here rail carriers and barges pay the same tax on fuel, we are struck by the fact that this tax is significantly less than the fuel tax paid by their primary competitors, motor carriers." *Id*., 606 N.W.2d at 61.

10

### IV. Tennessee's Taxes on Diesel Fuel Do Not Discriminate Against Railroads.

The purpose of the 4-R Act was not to grant railroads preferential treatment, but rather to remedy discrimination against the railroads and to place them on an even playing field with other state taxpayers. *ATSF*, 78 F.3d at 442. Prior to the 4-R Act railroads had been attractive targets for state and local taxing authorities because the physically immobile nature of their assets rendered unavailable the "exit" option for avoiding political exploitation. *See City of Superior,* 932 F.2d at 1186. The 4-R Act "was an effort to lift from their backs some of the heavy hand of state and local taxation." *Id.*

A tax is "discriminatory" within the meaning of subsection (b)(4) if it "imposes a *proportionately heavier* tax on railroading than on other activities." *Koeller*, 653 F.3d at 510 (emphasis added), *quoting City of Superior,* 932 F.2d at 1187. Here, local taxes are not an issue, diesel fuel is not an immovable asset, and the tax under attack is proportionately lighter. There is no tax discrimination against railroads here.

Under the 14th Amendment to the United States Constitution, a state is free to select the subjects of taxation and to grant exemptions, with neither due process nor equal protection imposing upon a State any rigid rule of taxation. *See Carmichael v. Southern Coal and Coke Co.*, 301 U.S. 495-509, 57 S.Ct. 868, 872 (1937). It is well settled that a state legislature is not bound to tax every member of a class or none. *Id.* It may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny those distinctions must be presumed to rest on that basis if there is any conceivable state of facts which would support it. *Id.*

There is a clear rational basis for the distinction between Tennessee's taxation of railroads and motor carriers on their purchase and consumption of diesel fuel. This distinction was drawn by the General Assembly in the 1940s when the motor fuel tax and the sales and use

11

tax first were enacted. *See* Tenn. Public Acts, 1941, Chapter 73, §§ 1(a), 1(b), 1(c), and 2; Tenn. Public Acts, 1947, Chapter 3, §§ 1, 2, 3, and 6 (copies attached to Exhibit 1). As illustrated by Exhibit 1, in the earlier years the tax burden imposed on motor carriers exceeded by several orders of magnitude the tax burden imposed on railroads and all other persons, with very narrow exceptions, for their purchase or consumption of diesel fuel. Motor carriers were exempted because they already paid the higher motor fuel tax. Railroads were not exempted because they were not already paying any other tax on motor fuel, but they were treated like the vast majority of all other persons.

The motor fuel tax, now called the Diesel Tax in Tenn. Code Ann. § 67-3-202, always has been allocated primarily to the state highway fund, which along with other fuel taxes essentially provides the budget for the Tennessee Department of Transportation (TDOT)[7]. Under the present allocation scheme, approximately 70% of the revenues from the diesel tax are allocated to the highway fund, while the bulk of the remaining revenues are allocated to cities and counties for use on roads. A small portion, however, is allocated to the general fund and for other purposes. *See* Tenn. Code Ann. § 67-3-905, 906, and 907. But there is nothing to prevent the General Assembly from allocating those revenues in any other way it may deem necessary or desirable, or to allocate additional revenues from the general fund to TDOT.

Until 1986, revenues from the sales and use tax paid by railroads on their purchase or consumption of diesel fuel were not distinguished from other revenues from the sales and use tax. In 1986, however, when the sales tax rate was 5½%, *see* Tenn. Code Ann. § 67-6-202 (1986

---

[7] This explanation of how the respective tax revenues are allocated is offered only for clarity and because Plaintiff's expert necessarily relies on such allocations to support his opinion that the motor fuel tax is a user fee and not a tax. This is nothing more than an attempted end-run around the holding of virtually all courts that the allocation of tax revenues is irrelevant to the issue of whether the respective tax burdens are discriminatory. The Commissioner contends that the allocation of revenues should not be considered. "[T]he use of the proceeds of a tax has no bearing on the question of whether the tax is discriminatory" under the 4-R Act. *Trailer Train v. State Tax Comm'n,* 929 F.2d 1300, 1303 (8th Cir. 1991), quoted in *Burlington Northern Railroad Co. v. Commissioner of Revenue,* 606 N.W.2d 54, 60 (Minn. 2000).

Supp.), the General Assembly elected to allocate sales and use tax revenues from all railroads from their purchase or use of diesel fuel to the Transportation Equity Fund for railway related programs.[8] *See* Tenn. Code Ann. § 67-6-103(b) (1986 Supp.). Since July 1, 1987, sales and use tax revenues at the rate of 5½% generated from the purchase or use of diesel fuel by all railroads have been allocated to the transportation equity fund and have been used by TDOT for the short line railroad track and bridge rehabilitation program. [Stip. No. 39] Revenues from later increases in the tax rate from 5½% to 7% have been allocated to the general fund or for educational purposes. *Id.* But the General Assembly has on occasion allocated supplemental funds to the Transportation Equity Fund, and there is nothing to prevent it from exercising its discretion to do so whenever it may choose, or to abolish the program altogether.

### V. The 4-R Act Reaches Only Tax Burdens and Not Tax Benefits.

The 4-R Act reaches only tax burdens and not tax benefits. *ATSF,* 78 F.3d at 443. "[T]he use of the proceeds of a tax has no bearing on the question of whether the tax is discriminatory' in an analysis under the 4-R Act." *Burlington Northern,* 606 N.W.2d at 60, quoting *Trailer Train,* 929 F.2d at 1303. In *Burlington Northern,* which is based on facts virtually identical to those here, that is, railroads and water carriers subject to sales and use tax on fuel but motor carriers exempt, the court entertained the railroad's subsection (b)(4) challenge, and held that the tax was not discriminatory. *Burlington Northern,* 606 N.W.2d at 61. The railroad urged the court to consider the expenditure of tax proceeds, arguing that motor carriers (and air carriers) received a direct benefit from the excise taxes they paid. *Id.,* 606 N.W.2d at 59. The response of the Minnesota Supreme Court in declining that invitation cannot be improved upon:

> The Commissioner counters that consideration of the expenditure of tax revenues or the ownership of rights of way here is difficult to

---

[8] Sales tax revenues from the purchase or use of fuel by water carriers and aviation carriers were similarly treated. *See* Tenn. Code Ann. § 67-6-103(b) (1986 Supp.).

13

conduct, inappropriate under the 4-R Act, and has absurd results. We agree. . . .

Similarly, looking beyond a tax and into the private circumstances of taxed entities, as BN would have us do here, would be equally complicated and have absurd results. To assess the rail carriers' obligations to maintain the rights of way they own would require an analysis of the cost of doing business for each mode of transportation. Then state taxation would have to be limited to only those taxes needed to equalize costs between the rail carriers and their competitors. This type of comparison would be "too difficult and expensive" to conduct, and does not lend itself to a "bright-line rule[ ] for simple judicial administration." *Trailer Train,* 929 F.2d at 1303.

In addition, an analysis of the use of tax revenues is not as simplistic as suggested by BN. BN argues that because motor carriers and air carriers benefit from expenditures from dedicated funds used to maintain the public rights of way, any taxes they pay directly benefit them. Yet the benefits and burdens of the use of public rights of way are not so clear or so direct. For example, rail carriers benefit from expenditures from the highway fund for highway maintenance because goods shipped by rail often begin and end their journeys on the public highways. In addition, some funds are used for projects that directly benefit rail carriers, such as railroad/highway crossings and bridges. Further, because rail carriers own their rights of way they do not have to share them with the public and can schedule and design maintenance to minimize disruption of transport routes.

We find most troubling the fact that invalidating the challenged tax here will not eliminate the alleged discrimination that other transportation modes use public rights of way and as a result do not have the obligations of the rail carriers, which own, construct, and maintain private rights of way. Therefore, even if the state imposed an identical tax on each of the transportation competitors, the rail carriers could still claim discrimination. *See* [*Burlington Northern Railroad Co. v.*] *Triplett,* 682 F.Supp. 443, [445-46] (D.Minn.1988) (accepting a "use" analysis and holding that a fuel excise tax imposed by Minnesota at the same rate of 17 cents per gallon on barges, rail carriers, and motor carriers was discriminatory because rail carriers paid for their "tracks"). This argument could be used to invalidate any tax applicable to rail carriers and does not factor in the benefits of owning one's rights of way. We do not believe Congress intended the 4-R Act to remedy this inherent difference between rail carriers and their competitors.

14

*Burlington Northern,* 606 N.W.2d at 60-61 (footnote omitted). Plaintiff representative Eric Jakubowski acknowledged in his deposition that a significant slice of Plaintiff's business is intermodal – containers that can move by rail, barge, or truck; that Plaintiff has an intermodal yard in Memphis; and that every container Plaintiff handles travels by truck at some point on its route. Jakubowski Deposition, p. 16, l. 24 through p. 20, l. 23. Plaintiff representative Robert Rogers acknowledged that Plaintiff owns its rights of way and that they cannot be used by anyone else without Plaintiff's permission. Rogers Deposition, p. 48, lns. 13-19. Railroads pay to construct and maintain their own rights of way[9]. Jakubowski Deposition, p. 14, lns.1-7. Sales and use tax proceeds of 5½% of the purchase price of diesel fuel purchased by all railroads are used for the short line railroad track and bridge rehabilitation program. [Stip. No. 39] Plaintiff has access to the open network of all Class I and all short line railroads in the state, Jakubowski Deposition, p. 41, l. 15 through p. 42, l. 3, and Plaintiff did business with thirteen Tennessee short lines. Exhibit 12 to Rogers Deposition, p. 39, l.21 through p. 44, l. 4. Furthermore, motor carriers are not the only beneficiaries of the highway transportation system. Millions of drivers in every conceivable kind of vehicle, along with cyclists and pedestrians, use the roads every day. It is thus apparent that the facts here are virtually identical to those noted by the *Burlington Northern* court when it wisely declined to evaluate tax benefits. In *Burlington Northern* the Minnesota Supreme Court got it exactly right.

The report of Plaintiff's expert, Dr. Richard R. Mudge, focuses on how revenues from the sales and use tax paid by railroads on their purchase or consumption of diesel fuel are spent as compared to how revenues from the motor fuel tax paid by motor carriers are spent. The report of Plaintiff's expert provides:

---
[9] Railroads also have the power of eminent domain. *See* Tenn. Code Ann. § 65-6-128.

The purpose of my testimony is to explain that the per-gallon excise taxes on motor fuels in the US and in Tennessee are dedicated user fees that provide tangible benefits to highway users, including the motor carrier industry. These user fees have historically been, and continue to be, the principal source of funds to construct, improve, and maintain highways. As such, these highway user fees directly benefit the trucking industry. In contrast, the sales tax on diesel fuel paid by the Illinois Central and other Class I railroads in Tennessee provide minimal benefits for Class I railroads.

Statement of Richard R. Mudge, Ph.D. (Plaintiff's Exhibit 36). The rebuttal report by Plaintiff's expert provides:

The expert report prepared by Professor Fox focuses on the costs imposed on the trucking and rail industry by state of Tennessee taxes. Professor Fox, however, does not consider the relative and absolute benefits that these payments provide to the respective industries. While it is interesting to compare which mode pays more according to some measure, my Report addresses whether the sales tax payments that Illinois Central makes to the state of Tennessee provide tangible benefits to Illinois Central.

Rebuttal Statement by Richard R. Mudge, Ph.D. (Plaintiff's Exhibit 37).

In his deposition Dr. Mudge goes so far as to opine that the dollars that Class I railroads pay in sales and use tax for fuel purchases should be traceable to the benefits they receive. For example:

Q. To have tax parity, not only must the level of taxation be the same and not only must the expenditure be for the same comparative kind of expenditure, obviously trucks use roads, trains use road beds and bridges -- you understand the question so far?

A. Yes.

Q. Not only must it be within the same modality, meaning Class 1 railroads, but it has to be closely related to the amount of tax paid by each Class 1 railroad?

A. In that case, the answer is clear, yes. The example you gave where it is balanced so that Illinois Central money they would pay would

16

be spent on Illinois Central rights-of-way and track, in that case it's clear that that would be balanced.

Mudge Deposition, p. 19, lns. 6-21 [Defendants' Exhibit 18]

> Q. What other taxpayers -- let me begin like this. Your view is the dollars that a particular Class 1 railroad pays in sales tax on its consumption of fuel should be traceable to the benefits that that Class 1 railroad receives?

> A. Yeah, all over time. It doesn't have to be -- in each individual year, it doesn't have to be identical, but they should be getting -- the trucking industry benefits accrue to the trucking industry in general. You don't trace it back to each individual trucking company.

> Q. Do you know of any other payer of sales tax in Tennessee that gets that kind of traceable payment and return benefit?

> A. I am not aware of them.

> Q. Aren't you asking for Class 1 railroads to be, for lack of a better term, a, quote, most preferred, closed quote, taxpayer?

> A. If the trucking industry also paid the same sales tax on diesel fuel, then it would be a very different situation. It's only the railroads being asked to pay sales tax on diesel fuel, not the trucking industry.

Mudge Deposition, p. 21, l. 23, through p.22, l. 20, *id*. It is apparent that Plaintiff's expert's opinion, that the motor fuel tax is a user fee as opposed to a tax, has no basis unless the court is to undertake an evaluation of relative overall tax benefits, a thicket of subjectivity and uncertainty into which few courts have dared to tread. Furthermore, the opinion that the motor fuel tax, which has been called a tax by the General Assembly for over 70 years, is not a tax but, rather, a user fee, is a legal conclusion that Plaintiff's expert is not qualified to render. (See discussion below). Thus, the report and testimony of Plaintiff's expert should not be allowed because his opinion rests on an evaluation of tax benefits that has no place in an analysis of tax discrimination under the 4-R Act. *See ATSF,* 78 F.3d at 443; *Burlington Northern,* 606 N.W.2d at 60-61.

## VI. The Motor Fuel Tax Is Not a User Fee.

The tax imposed on motor carriers' use of fuel is a general revenue tax, not a user fee. A user fee is "a specific charge imposed by the State for the use of state-owned or state-provided transportation or other facilities." *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 621 (1981). To be a user fee, a charge must bestow "a benefit on the [payer], not shared by other members of society." *National Cable Television Ass'n v. United States,* 415 U.S. 336, 341 (1974). If a charge fails to confer a particular benefit on the payer that is not available to the public at large, then it is more properly characterized as a tax, not a fee. *Skinner v. Mid-America Pipeline Co.,* 490 U.S. 212, 214 (1989).

The Tennessee General Assembly consistently and unambiguously has described the motor fuel tax as a use tax, not a fee, in the language of the taxing statute itself. *See* Tenn. Code Ann. § 67-3-202(a). Moreover, in the sales and use tax code, the General Assembly makes clear that the motor fuel tax paid by motor carriers is the functional equivalent of the sales and use tax paid by railroads. Tenn. Code Ann. § 67-6-329(a)(2). This tax, like the sales and use tax, is administered by the state's primary taxing authority, the Tennessee Department of Revenue. Although most of the tax proceeds are allocated to the highway fund and to local jurisdictions for use on roads, a portion is allocated to the state general fund. Payment of the use tax does not confer upon motor carriers any particular benefit not shared by the public at large. While the bulk of the proceeds are designated for highway and road improvements, these projects benefit all members of society, including other motorists and even the railroads, which are dependent on trucks to pick up and deliver intermodal containers and other products. Neither the motor carriers nor other motorists are entitled to these benefits, however, and the General Assembly is free to change the distribution of the fuel tax proceeds without affecting the validity of the tax.

18

This conclusion is supported by two other states' courts that have examined the basic nature of their IFTA-administered fuel taxes. In *Anderson v. Department of State Revenue,* 758 N.E.2d 597, 602 n.3 (Ind. Tax Ct. 2001), the court held that Indiana's motor carrier fuel tax clearly was a tax, not a user fee. The court reasoned that the tax was compulsory and entitled the motor carriers to receive nothing more than the same rights enjoyed by all citizens alike. *Id.* No particular benefit was conferred upon the motor carriers upon their payment of the tax. *Id.* Similarly, in *Owner-Operator Independent Drivers Ass'n v. Bower,* 757 N.E.2d 627, 1052 (Ill. App. Ct. 2001), the court held that Illinois' motor fuel use tax was "a general revenue tax and not a user fee," despite the fact that some tax proceeds were designated for transportation-related purposes. As in other states, the Illinois legislature enacted its fuel tax to comply with IFTA requirements. *Id.* at 1049. The court observed that a "plain reading of the statute" describes the motor fuel tax as a use tax. *Id.* at 1052; *see also* 49 U.S.C.A. § 31701(2). The fuel tax, in implementation was a "species of use tax" that was "designed to prevent the avoidance of Illinois sales tax." *Id.* Moreover, payment of the fuel tax conferred no special benefit on motor carriers but merely placed them "in the same position as all other persons who purchase gasoline or diesel fuel" in the state. *Id.* at 1053. In accordance with these authorities, Tennessee's motor fuel tax, as a matter of law, clearly constitutes a tax, and not a user fee.

The legal distinction between taxes and user fees commonly arises in cases where local governments or administrative agencies lack authority to impose taxes and, thus, can justify imposing specific charges only as user fees that are reasonably related to the specific benefits provided to the payers. *See, e.g., National Cable Television Ass'n,* 415 U.S. at 340-41; *Diginet, Inc. v. Western Union ATS, Inc.*, 957 F.2d 1388, 1399 (7th Cir. 1992). Such concepts have no

application in cases such as this one, where the state clearly has the general authority to tax privileges and has characterized the motor fuel tax as a use tax, not a fee.

### VII.  Comity Requires a Remedy Limited to Actual Discrimination.

In *Koeller,* the only federal appellate decision on the merits involving subsection (b)(4) since *CSX,* the court opined that although an injunction was possible, "principles of comity require the federal court to act with restraint."  *Koeller,* 653 F.3d at 512.  "For that reason, any injunction should 'eliminate only [the] discriminatory effects rather than enjoining the entire rate or assessment scheme and requiring state authorities to comply with federal law from scratch.' " *Id. (*quoting *McNamara*, 817 F.2d at 378; and citing *Clinchfield Railroad Co. v. Lynch,* 700 F.2d 126, 131 n.6 (4th Cir. 1983) (noting in a 4-R Act property tax case that the district court had properly crafted a limited remedy rather than striking down the offending tax as a nullity and stating that Congress had "determined that the Constitution does not forbid an exercise of equitable powers of correction to correct federally protected rights, instead of a total eradication of unlawful state activity." ).

This case involves only one kind of taxes, privilege taxes, and only one kind of privilege taxes, sales and use taxes.  This case involves only one taxing authority, the state, whereas sales and use tax cases sometimes may involve a myriad of local option taxes imposed in counties and cities.  That is not the situation here.  In *McNamara* the court noted that partial injunctions against discriminatory taxes and tax assessments are appropriate when "they involve *one* kind of tax and *one* taxing authority."  *McNamara,* 817 F.2d at 379 (emphasis in original).

Plaintiff has pending in the Davidson County Chancery Court a refund action seeking a refund of *all sales and use taxes* paid by Plaintiff on its purchase or use of diesel fuel in Tennessee for *2005 through 2010*.  Plaintiff seeks a declaratory judgment here that can be used

to obtain a complete refund in state court. Fuel prices, a phenomenon over which the state has no control, spiked in 2008, only to be followed by a precipitous decline in 2009. In the event that this court should rule that the imposition of sales and use tax on Plaintiff's purchases of diesel fuel in Tennessee is discriminatory under subsection (b)(4), based upon the authorities cited above, the most onerous remedy against the Commissioner should be crafted to limit Plaintiff's recovery to a refund of taxes paid in 2008 that exceeded by at least 5% the 17 cent per gallon tax paid by motor carriers. *See* 49 U.S.C.A. § 11501(c). Given the 70 year history of a higher tax being paid by motor carriers, however, Plaintiff is entitled to no remedy at all.

### Conclusion

For all of the foregoing reasons, the Commissioner is entitled to a judgment of dismissal.

Respectfully submitted,

ROBERT E. COOPER, JR.
Attorney General and Reporter

_____s/Talmage M. Watts_____
TALMAGE M. WATTS (#015298)
Assistant Attorney General
Attorney General's Office – Tax Division
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-6431 *telephone*
(615) 532-2571 *fax*
talmage.watts@ag.tn.gov

Counsel for Defendants

21

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing Trial Brief has been served on the persons listed below by means of the court's electronic filing system this 29th day of May, 2012.

    s/Talmage M. Watts

| | |
|---|---|
| James W. McBride<br>jmcbride@bakerdonelson.com<br>BAKER, DONELSON, BEARMAN,<br>CALDWELL & BERKOWITZ<br>555 Eleventh Street, N.W., 6th Floor<br>Washington, D.C. 20004<br>Telephone: (202) 508-3467<br>Fax: (202) 508-3402<br><br>Stephen D. Goodwin (006294)<br>sgoodwin@bakerdonelson.com<br>BAKER, DONELSON, BEARMAN,<br>CALDWELL & BERKOWITZ<br>First Tennessee Bank Building<br>165 Madison Avenue, Suite 2000<br>Memphis, TN 38103<br>Telephone: (901) 577-2141<br>Fax: (901) 577-0734 | Carolyn W. Schott (021811)<br>cschott@bakerdonelson.com<br>BAKER, DONELSON, BEARMAN,<br>CALDWELL & BERKOWITZ<br>Baker Donelson Center<br>211 Commerce Street, Suite 800<br>Nashville, TN 37201<br>Telephone: (615) 726-7312<br>Fax: (615) 744-7312 |