# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| ILLINOIS CENTRAL RAILROAD COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> TENNESSEE DEPARTMENT OF REVENUE and REAGAN FARR, Commissioner of Revenue of the State of Tennessee, <br><br> Defendants. | No. 3:10-cv-00197 <br> Judge Sharp |

## MEMORANDUM

This action is brought under Section 306(1)(d) of the Railroad Revitalization and Regulatory Reform Act of 1976 ("Section 306" or the "4-R Act"), 49 U.S.C. § 11501(b)(4), which prohibits state and local governments from discriminating against railroads with respect to taxation. Plaintiff contends that the sales and use tax assessments imposed by the State are discriminatory because motor carriers are exempt from the tax, but rail carriers are not exempt. Plaintiff seeks injunctive and declaratory relief pursuant to Section 306. The matter is before the Court on the following motions, which were filed following remand of this matter by the United States Court of Appeals for the Sixth Circuit, (Docket No. 107): *Plaintiff Illinois Central Railroad Company's Motion for Summary Judgment* (Docket No. 85); *Defendants' Motion for Summary Judgment* (Docket No. 93); and *Defendants' Motion to Exclude Affidavit and Testimony of Richard Pomp* (Docket No. 102).

# I. PROCEDURAL HISTORY

This Court held a bench trial in this matter on June 5 and 11, 2012. In its Findings of Fact and Conclusions of Law, (Docket No. 59), this Court found that the imposition of Tennessee sales and use tax on railroad diesel fuel, but not on diesel fuel used by interstate motor carriers, placed rail carriers at an overall disadvantage. The Court further found that Defendants had not provided sufficient evidence that the differential tax treatment is justified. The Court concluded that the imposition of the sales and use tax on railroad diesel fuel violates 49 U.S.C. § 11501(b)(4). (Id.). By an accompanying order, this Court declared that the imposition of sales and use taxes authorized by Tennessee law on Plaintiff's purchases or consumption of diesel fuel for rail transportation purposes violates § 11501(b)(4).[1] The order further permanently enjoined Defendants from assessing, levying, or collecting sales and use taxes on or from Plaintiff on its purchase or consumption of diesel fuel for rail transportation purposes. See (Docket No. 60).

Defendants appealed the judgment to the Sixth Circuit Court of Appeals. See Circuit Case No. 13-6348. After briefing and oral argument, but before the issuance of an opinion by the Sixth Circuit, the United States Supreme Court issued its opinion in Alabama Dept. of Revenue v. CSX Transportation, Inc., 135 S.Ct. 1136, 1143 (2015) ("CSXT II"), ruling that "an alternative, roughly equivalent tax is one possible justification that renders a tax disparity nondiscriminatory."[2] Following the Supreme Court's decision, Plaintiff filed a motion in the

---

[1] A two-step inquiry is used to evaluate a claim of discrimination in violation of § 11501(b)(4). See CSX Transp., Inc. v. Ala. Dep't of Revenue, 131 S.Ct. 1101, 1105 & 1109 n.8 (2011) ("CSXT I"). A plaintiff has the initial burden to establish a prima facie case of discriminatory tax treatment. If a plaintiff does so, the burden shifts to the defendant taxing authority to establish that the differential tax treatment is justified and does not discriminate against the railroad. Id. If the defendant cannot meet its burden, the tax treatment violates § 11501(b)(4). Id.

[2] In its previous opinion, this Court relied upon CSXT I as well as the Eleventh Circuit's decision in CSX Transp., Inc. v. Ala. Dep't of Revenue, 720 F.3d 863 (11th Cir. 2013). Subsequent to this Court's previous decision, Alabama successfully sought review of the Eleventh Circuit's decision by *writ of certiorari*, resulting in the Supreme Court's decision in CSXT II.

Sixth Circuit to remand the matter to this Court for further proceedings in light of CSXT II. The Sixth Circuit granted that motion by order entered May 11, 2015 and remanded the matter to this Court for further proceedings.

The parties then filed a joint motion to schedule a status conference, which was granted. (Docket No. 77). That status conference was held on August 20, 2015, and as a result, the Court issued an order calling for supplemental briefs, responses to supplemental briefs, and reply briefs.

## II. RELEVANT FACTS[3]

Plaintiff Illinois Central Railroad Company ("Plaintiff" or "ICRR") is an Illinois corporation with its principal office in Homewood, Illinois. ICRR is engaged in interstate commerce as a common carrier by railroad. ICRR is the corporate holding company for some of the U.S. properties of Canadian National Railway and is the entity that pays taxes in Tennessee. ICRR does business under the trade name CN, and CN is sometimes used to refer to the Plaintiff in this case.

The Tennessee Department of Revenue ("Department") is the department of the State of Tennessee charged with the responsibility to administer and collect sales and use taxes within Tennessee. Tenn. Code Ann. § 67-1-101(b). The Department is also charged with the responsibility to administer and collect motor fuel taxes within Tennessee. Id. Defendant Commissioner of Revenue of the State of Tennessee ("Commissioner," or collectively with the Department, hereinafter, "Defendants" or the "State") is named in this action in his official capacity only. The Commissioner exercises general supervision over administration of the

---

[3] The parties have stipulated to many of the underlying facts in this matter. The Court admitted the stipulated facts at trial. See (Docket Nos. 45 & 52). Unless otherwise noted, the facts are drawn from the parties' stipulations, statements of material facts, and related declarations and exhibits.

assessment and collection of sales and use taxes and motor fuel taxes in Tennessee. The Tennessee Department of Transportation ("TDOT") is charged with building and maintaining public roads in Tennessee.

Generally, Tennessee imposes a tax on the sale, consumption, and use of tangible personal property in Tennessee. See Tenn. Code Ann. § 67-6-101 *et seq*. The sales tax is collected by the seller at retail from the purchaser and paid over to the Commissioner by the seller. See Tenn. Code Ann. §§ 67-6-502 -504. The Tennessee sales tax applies unless a sales tax on such property has previously been paid in another jurisdiction. Tenn. Code Ann. §§ 67-6-201(2) and (5), 67-6-202, and 67-6-203.

Railroads are subject to sales or use tax on their purchase, consumption, or use of diesel fuel in Tennessee. For years 2006 through June 2014, the tax was imposed by the State at the rate of 7% of the retail price. ICRR holds a direct pay permit issued by the Department and pays state sales and use taxes upon its purchase of diesel fuel within this State directly to the Commissioner.

On-highway motor carriers compete with rail carriers for the transportation of property in interstate commerce in Tennessee. Motor carriers are exempt from the Tennessee sales and use tax imposed by chapter 6 of Title 67 on the purchase or consumption of diesel fuel in Tennessee. See Tenn. Code Ann. § 67-6-329 (a)(2).

In lieu of the sales tax, motor carriers pay a motor fuel tax totaling 18.4¢ a gallon. Tenn. Code Ann. § 67-3-202 -205. Under Tenn. Code Ann. §§ 67-3-203 and 204, 1¢ of the 18.4¢ is a special privilege tax, and 0.4¢ is an environmental assurance fee. Approximately 70% of the motor fuel taxes collected from motor carriers is allocated to the Tennessee Department of Transportation. Approximately 28% is allocated to cities and counties and designated for use on

roads. Approximately 2% is allocated to the general fund. In addition to the sales and use tax, railroads also pay the 1¢ special privilege tax and 0.4¢ environmental assurance fee imposed under Tenn. Code Ann. §§ 67-3-203 and 204.

Tennessee's motor fuel tax was first enacted in 1941 and has been applied to motor carriers since then. The broadly applicable sales and use tax, which applies to railroads, was first enacted in 1947, and motor carriers have always been exempt from that tax. Under the respective tax rates (17¢ per gallon for motor carriers, in contrast to 7% of the purchase price for railroads) in effect since before 2006 through June 30, 2014, motor carriers were taxed more per gallon of diesel fuel than railroads were taxed unless fuel prices exceeded $2.62 per gallon. In fact, from 1941 through 2010, motor carriers actually paid more tax per gallon than railroads paid in every year except one, which was in 2008 when fuel prices spiked. The State of Tennessee has no control over the price of diesel fuel.

Tennessee, along with the other 47 contiguous states and bordering Canadian provinces, is a party to the International Fuel Tax Agreement ("IFTA"), the purpose of which is to simplify the collecting and reporting of taxes on motor fuel used by motor fuel carriers operating in more than one jurisdiction. State participation in IFTA is essentially mandated by federal legislation. See 49 U.S.C. §§ 31701–07. IFTA requires that the fuel use tax imposed by member jurisdictions be measured by the consumption of fuel in a motor vehicle. See 49 U.S.C. § 31701(2). Motor carriers register and file tax returns in a single base jurisdiction, which, in turn, is responsible for distributing the tax proceeds to other jurisdictions in which the carrier operates. Motor carriers receive in each jurisdiction a credit or refund for taxes paid on fuel used outside the jurisdiction where it was purchased. There is no similar multi-state agreement with respect to fuel purchased, used, or consumed by railroads.

5

# III. ANALYSIS

I. **Motion to Exclude Affidavit and Testimony of Richard Pomp**

As a preliminary matter, Defendants have moved to exclude the affidavit of Plaintiff's expert, Richard Pomp, under Rules 702 and 703 of the Federal Rules of Evidence. The Court will first address this issue and then move on to the substantive claims.

Plaintiff engaged Professor Richard Pomp, law professor at the University of Connecticut Law School and adjunct professor at NYU Law School in the L.L.M. Program for Taxation, to render an expert opinion regarding "the meaning of a 'comparable' or 'roughly equivalent' tax as that term is understood by practitioners and scholars in the field of state taxation." (Docket No. 90 at ¶ 5).

Defendants argue that "[b]eyond a bare recitation of qualifications and facts, the affidavit consists entirely of a discussion of purportedly applicable law, legal conclusions, and arguments concerning the central legal issue now before the Court—whether the sales tax paid by railroads on diesel fuel purchases in Tennessee and the motor fuel excise tax paid by trucks are 'alternative, roughly equivalent' taxes within the meaning of [CSXT II]." (Docket No. 103 at 1). Plaintiff counters that "Professor Pomp does not opine on the ultimate legal issue of whether the sales tax assessed to ICRR is discriminatory[.]" (Docket No. 105 at 2). Regardless, Plaintiff argues "his testimony fits squarely within the scope of permissible expert testimony under the Federal Rules of Evidence and Sixth Circuit precedent." (Id.).

Expert testimony may be introduced in summary judgment proceedings through an affidavit or declaration that satisfies the general requirements for summary judgment affidavits and declarations set forth in Fed. R. Civ. P. 56(c)(4). See 11 James Wm. Moore *et al.,* Moore's Federal Practice § 56.94[4][a] (3d ed. 2011). Reports and the underlying opinions are subject to

all other rules of evidence, including traditional standards for the admissibility of expert testimony. See Fed. R. Evid. 702; Pride v. BIC Corp., 218 F.3d 566, 577 (6th Cir. 2000) (citing Daubert v. Merrell Dow Phar., 509 U.S. 579 (1993)). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Defendants seek to exclude Pomp's testimony under Rules 702 and 703 of the Federal Rules of Evidence (Docket No. 103 at 3-9), arguing that (1) Pomp's affidavit is legal argument and advocacy – and improper as expert testimony; (2) Rule 702 does not permit expert testimony on conclusions of law; (3) "calling a brief an affidavit" does not make it admissible; (4) "couching the affidavit as 'policy' rather than law does not alter its true character;" and (5) Pomp's affidavit is not reliable and because of his lack of qualifications.

"Rule 702 imposes a special obligation upon a trial judge to ensure that scientific testimony is not only relevant, but reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (citing Daubert, 509 U.S. at 579). This basic gatekeeping obligation applies to all expert testimony. Kumho Tire Co., 526 U.S. at 147.[4]

The requirement that expert testimony be relevant and reliable "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically

---

[4] Courts may also review the factual basis for an expert's testimony under Rule 703 of the Federal Rules of Evidence. Under Rule 703, expert opinions based on otherwise inadmissible facts and data are to be admitted only if the facts and data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703.

7

valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Decker v. GE Healthcare Inc., 770 F.3d 378, 391 (6th Cir. 2014) (citations omitted). "In short, under Daubert and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues." Id. (citations omitted). "The [Rule 702] inquiry is a flexible one . . . [and its focus] must be solely on principles and methodology, not on the conclusions that they generate." Lee v. Smith & Wesson Corp., 760 F.3d 523, 526 (6th Cir. 2014) (citing Daubert, 509 U.S. at 595).

Daubert provides a non-exclusive, flexible checklist of factors to consider when evaluating reliability, including the following: "whether [the theory or technique] can be (and has been) tested"; "whether the theory or technique has been subjected to peer review and publication"; "in the case of a particular scientific technique, . . . the known or potential rate of error"; and the degree of acceptance within the relevant scientific community. Daubert, 509 U.S. at 593–94. "[T]he Daubert factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case." In re Scrap Metal Antitrust Litig., 527 F.3d 517, 529 (6th Cir. 2008) (citations omitted). "[T]he Daubert factors 'are not dispositive in every case,' and should be applied only 'where they are reasonable measures of the reliability of expert testimony.'" Id. (citations omitted).

An expert opinion "is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Indeed, the "[Sixth Circuit has] held that an expert opinion may opine on a legal conclusion so long as his testimony would not determine an ultimate issue before the jury." U.S. v. Geiger, 303 Fed. App'x. 327, 331 (6th Cir. 2008). The Court's discretion to admit expert

8

testimony in bench trials is particularly broad at earlier stages in the proceeding, such as summary judgment. Gonzalez v. Nat'l Bd. of Med. Exam'rs, 225 F.3d 620, 635 (6th Cir. 2000) ("[D]istrict courts conducting bench trials have substantial flexibility in admitting proffered expert testimony at the front end, and then deciding for themselves during the course of trial whether the evidence meets the requirements of Kumho Tire Co. and Daubert and deserves to be credited.").

Here, the Court finds that Plaintiff's expert, Professor Pomp, has displayed sufficient knowledge of the subject matter that his opinion will assist the trier of fact in evaluating this case. However, given that this case is a bench trial, the Court is mindful it can weigh its probative value and reject any improper inferences. Defendants' complaints about Professor Pomp's opinions go to the weight of the testimony as opposed to their admissibility. Plaintiff, as the proponents of the testimony, do not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable. Here, the Court finds that Professor Pomp's opinions are reliable. Thus, Defendant's motion is denied.

## II. Cross Motions for Summary Judgment

Finally, the parties have filed cross motions for summary judgment quarrelling over whether the State can meet its burden to prove that the use tax paid by interstate motor carriers constitutes sufficient justification for the exemption of motor carriers from the sales tax, which is imposed on railroads.

### A. *Standard of Review*

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914

(6th Cir. 2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The standard remains the same when both parties move for summary judgment. Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991). "When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." Wiley v. United States (In re Wiley), 20 F.3d 222, 224 (6th Cir. 1994).

B. *Analysis*

The issue before this Court on remand is whether Defendants can offer sufficient justification for subjecting railroads and motor carriers to different tax treatment of their purchases and consumption of diesel fuel for transportation purposes. See CSXT I, 131 S.Ct. at 1109 n.8. The Supreme Court has instructed that "an alternative, roughly equivalent tax is one possible justification that renders a tax disparity nondiscriminatory," CSXT II, 135 S.Ct. at 1144.

The Court must first address the parties' dispute on whether the compensatory tax doctrine is applicable to this case. Plaintiff insists that "CSXT II's direct reference to the Supreme Court's negative Commerce Clause jurisprudence (i.e., the Compensatory Tax Doctrine) is the clearest direction that the lower courts have received from CSXT II." (Docket No. 108 at 8). Defendants maintain the doctrine is inapplicable.

Plaintiff argues "[i]n holding that a facially discriminatory tax on railroads – as we unquestionably have here – can possibly be justified by a 'roughly equivalent' or 'roughly comparable' tax on their competitors," the Court was "invoking a rich history of Supreme Court jurisprudence establishing a specific and settled standard under its 'negative Commerce Clause' cases." (Docket No. 86 at 10). Plaintiff contends that the Court cited Gregg Dyeing Co. v. Query, 286 U.S. 472, 479–80 (1932) to invoke its "negative Commerce Clause cases," which afford "a guiding light for deciding when two different taxes are 'roughly equivalent.'" (Id. at 12). Defendants counter "[i]f the Supreme Court had intended to define the precise analytical parameters of 'roughly equivalent' for use by lower courts in 4-R Act cases it would have done so. It did not." (Docket No. 100 at 4).

In CSXT II, the Supreme Court cited Gregg Dyeing and observed that "[o]ur negative Commerce Clause cases endorse the proposition that an additional tax on third parties may

11

justify an otherwise discriminatory tax." 135 S.Ct. at 1143. This is the first and only time either Gregg Dyeing or the Commerce Clause is mentioned. In Gregg Dyeing, the Supreme Court was addressing the threshold issue of whether a state tax violated the Commerce Clause. The Court rejected a negative Commerce Clause challenge to a South Carolina tax on imported gasoline stored for use or sale within the state "upon which a like tax ha[d] not been paid under other statutes." 286 U.S. at 479. The Court held that, because the taxpayer had not established that it had suffered discrimination as a result of the state tax, it had not proved that the state tax violated the Commerce Clause.

This Court does not interpret the Supreme Court's single reference of the Commerce Clause as explicit direction to apply the compensatory tax doctrine here. The plain language of the opinion instructs that "an alternative, roughly equivalent tax is one possible justification that renders a tax disparity nondiscriminatory," CSXT II, 135 S.Ct. at 1144 − and the Court will proceed with that instruction, simply analyzing whether the taxes paid by motor carries is roughly equivalent to those paid by the locomotives.

Proceeding to the substantive issues before the Court, as stated *supra*, the Supreme Court directed the Eleventh Circuit (and now this Court pursuant to the Sixth Circuit's remand Order) to consider "whether Alabama's fuel-excise tax is the rough equivalent of Alabama's sales tax as applied to diesel fuel, and therefore justifies the motor carrier sales-tax exemption." CSXT II, 135 S. Ct. at 1144. Therefore, this Court must determine the same as it pertains to the Tennessee taxes. As Plaintiff correctly points out in its brief,[5] the burden is now on Defendants to prove sufficient justification for exempting motor carriers from the sales tax, which is imposed on railroads. Defendants' Motion for Summary Judgment relies on two arguments supporting that

---

[5] "One principle is clear from the Supreme Court's two decisions in the Alabama CSXT cases—the burden is now on the State." See (Docket No. 86 at 7).

12

justification. First, Defendants argue that "motor fuel taxes paid by motor carriers and sales and use taxes paid by railroads are alternative, roughly equivalent taxes on the same activity within the meaning of CSX[T] II[.]" (Docket No. 94 at 5-6). Second, they argue that "railroads choose tax treatment different from that of motor carriers because railroads choose to use dyed diesel fuel, which is not exempt from sales and use taxes." (Id. at 6).

1. *Motor Fuel Taxes and Sales and Use Taxes are Roughly Equivalent*

Defendants first point to CSXT II, wherein the Supreme Court stated, "[w]e think Alabama can justify its decision to exempt motor carriers from its sales and use tax through its decision to subject motor carriers to a fuel-excise tax," arguing the same applies here. (Docket No. 94 at 6) (citing CSXT II, 135 S.Ct. at 1143). Defendants posit that motor fuel taxes paid by motor carriers and sales and use taxes paid by railroads "are alternative, roughly equivalent taxes imposed by the same taxing authority on the same activity, the purchase or consumption of diesel fuel for freight-transportation purposes within the meaning of CSX[T] II." (Id.). In comparison, Defendants argue "[f]or 61 successive years, from the inception of the sales tax in 1947 through 2007, the per gallon level of the sales tax on fuel purchases by railroads was less than the per-gallon level of the motor fuel excise tax paid by trucks." (Docket No. 100 at 13) (citing [Doc. 72-10, Defendants' Trial Exh. D-10] Fox Affidavit, ¶ 5). Plaintiff makes the following arguments rebutting Defendants' position:

> At the previous trial of this matter, the State heavily relied on the calculation of a "tax rate" comparison to show that the "rate" of the motor fuel tax on a gallon of motor carrier fuel exceeded the "rate" of the sales tax on a gallon of railroad fuel. Obviously, this comparison depends solely on the fluctuating cost of fuel. The cost of fuel makes no difference in the rate of 17¢ per gallon for motor fuel, but the cost of fuel makes all the difference in a sales tax applied to a purchase price. Indeed, the basic tax rate on diesel fuel has been 17¢ per gallon since 1989. And as the affidavit of Benjamin Blair demonstrates, more recent data show that the "rate" of the sales tax is now often exceeding the rate of the motor fuel tax. See Blair Affidavit, ¶ 13. For five of the eight years between 2007 and the first half of

13

> 2014, the sales tax rate of 7% on ICRR's purchase of railroad diesel fuel in
> Tennessee exceeded the rate of 17¢ per gallon paid by interstate motor carriers on
> their consumption of diesel fuel in Tennessee. Thus, the State's heavy reliance on
> an equivalent tax rate is invalid factually.

(Docket No. 86 at 16) (internal citations omitted). Defendants respond that "while it is true that per-gallon fuel taxes for Illinois Central exceeded the per gallon cost for trucks from 2011 through June 30, 2014, this three and one-half year stretch was a gross historical anomaly." (Docket No. 100 at 14). Further, "based on current fuel prices, if the sales tax regime on railroad fuel were still in effect today the per-gallon rate for railroads would again be less than 17¢, which is consistent with historical norms." (Id.) (citing Fox Affidavit, ¶¶ 4-5).[6]

The CSXT II Court said

> [w]e think Alabama can justify its decision to exempt motor carriers from its sales
> and use tax through its decision to subject motor carriers to a fuel-excise tax. It
> does not accord with ordinary English usage to say that a tax discriminates against
> a rail carrier if a rival who is exempt from that tax must pay another comparable
> tax from which the rail carrier is exempt. If that were true, both competitors
> could claim to be disfavored—discriminated against—relative to each other.

135 S.Ct. at 1143. In this instance, the Court finds the taxes paid by motor carriers and rail carriers roughly equivalent. It is undisputed (and even stipulated to in the prior trial) that from 1941 through 2010 motor carriers actually paid more tax per gallon than railroads paid in every year except one, which was in 2008 when fuel prices spiked. While it is true, and not contested, that the sales tax rate of 7% on ICRR's purchase of railroad diesel fuel in Tennessee exceeded the rate of 17¢ per gallon paid by interstate motor carriers on their consumption of diesel fuel in Tennessee in recent years, on average, motor carriers have a higher tax burden—which refutes

---

[6] Another issue of contention is the allocation of tax proceeds. However, the Court need not expand upon this argument because the Sixth Circuit recently provided direction on this very issue: "[H]ow Tennessee uses the proceeds of its taxation of diesel fuel is irrelevant to the question of whether the Railroads have been discriminated against within the meaning of the 4-R Act." BNSF Railway Co. v. Tennessee Department of Revenue, 800 F.3d 262, 274 (6th Cir. 2015).

the railroads being at an overall disadvantage. Accordingly, Defendants have presented sufficient evidence to support their contention that the fuel tax placed on motor carriers and the sales and use tax paid by railroads are roughly equivalent.

2. *Railroads Choose to Use Dyed Diesel Fuel, Which is Not Exempt From Sales and Use Taxes*

Finally, Defendants insist that Plaintiff pays sales and use taxes only because it selects to burn dyed diesel fuel, as opposed to clear diesel fuel in its railroads. (Docket No. 94 at 9). Defendants argue further that no state or federal law prevents Plaintiff from burning clear diesel fuel, "in which case it would have been subject to the same motor fuel tax, Tenn. Code Ann. § 67-3-202, that motor carriers paid." (Id.). By it terms, Defendants contend, "the exemption from sales and use tax that applies to motor carriers," Tenn. Code Ann. § 67-6-329(a)(2), "is not an exemption for any particular class of taxpayers but rather for fuel taxed under Tenn. Code Ann. § 67-3-202, which applies only to clear (undyed) diesel fuel. The dyed fuel used by railroad locomotives is thus not exempt." (Id. at 9). It is the opinion of Defendants that since clear diesel is subject to a federal fuel tax,[7] Plaintiff chooses to use dyed diesel to sidestep the administrative burden involved in applying for tax refunds (which are available if clear diesel is used off-road). (Id.).

Plaintiff agrees in part. Plaintiff contends if it were to "choose" to use clear diesel fuel for off highway purposes, it would have to pay not only Tennessee's motor fuel tax, but also the federal excise tax. (Docket No. 96 at 11). This in turn, according to Plaintiff, would require it to petition the Internal Revenue Service for refunds of the federal excise tax because the fuel was used for off-highway purposes. (Id.). Thus, Plaintiff argues, the notion that Tennessee is

---

[7] See 26 U.S.C.A. § 4041.

"justified in denying the sales tax exemption to railroads because railroads could 'choose' to purchase clear diesel fuel is ludicrous." (Id. at 13).[8]

Plaintiff further purports there are practical problems if it were to elect to use clear diesel fuel. (Docket No. 96 at 12). First, Plaintiff argues, the purchase of clear diesel fuel in tanks of locomotives fueled in other states would result in the mixing of clear and dyed fuel, a practice prohibited by federal law. (Id.) (citing Declaration of Mathieu Lefebvre, ¶¶ 5, 6; Supplemental Affidavit of Benjamin Blair, ¶ 2). Second, Plaintiff would pay the full state motor tax to Tennessee on "a 'point of purchase' basis, without apportionment based on use in Tennessee, in contrast to interstate motor carriers under IFTA. (Id.) (citing Affidavit of Benjamin Blair [Doc. 88], ¶ 7. See Declaration of Mathieu Lefebvre, ¶¶ 5, 6; Supplemental Affidavit of Benjamin Blair, ¶ 2).

It is undisputed that railroads choose tax treatment different from that of motor carriers because railroads choose to use dyed diesel fuel, which is not exempt from sales and use taxes, and no state or federal law prevents Plaintiff from burning clear diesel fuel. Consequently, the Court finds Defendants have offered sufficient justification that its tax structures for diesel are not discriminatory against railroads.

## IV. CONCLUSION

The Court finds that no genuine issues of fact remain, and Defendants have shown sufficient justification for the disparate sales tax treatment of rail carriers compared to motor carriers. Therefore, the imposition of the sales and use tax on railroad diesel fuel does not violate 49 U.S.C. § 11501(b)(4).

---

[8] In support of its contention, Plaintiff cites Kraft Gen'l Foods, Inc. v. Iowa Dep't of Revenue, 505 U.S. 71 (1992). In Kraft, the Supreme Court held that an Iowa statute that denied a dividend-received deduction to foreign subsidiaries while allowing it for domestic subsidiaries discriminated in violation of the Foreign Commerce Clause. 505 U.S. at 82. The Court finds there is no meaningful distinction between the discrimination held unconstitutional in Kraft and the discrimination challenged here.

For all of the reasons stated, the Court will grant *Defendants' Motion for Summary Judgment* (Docket No. 93) and deny *Plaintiff Illinois Central Railroad Company's Motion for Summary Judgment* (Docket No. 85). Further *Defendants' Motion to Exclude Affidavit and Testimony of Richard Pomp* (Docket No. 102) will be denied.

An appropriate Order shall be entered.

*[signature: Kevin H. Sharp]*
―――――――――――――――――――――
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE